**SO ORDERED.**

**SIGNED this 6 day of February, 2018.**

*Stephani W. Humrickhouse*
_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## FAYETTEVILLE DIVISION

IN RE:

| | |
|---|---|
| **TEDDY DALE PARKER** | **CASE NO. 12-05848-8-SWH** |
| **VICTORIA STONE PARKER** | **CHAPTER 11** |

**MARGARET WESTBROOK, Plan Trustee, AND
RREF BB ACQUISITIONS, LLC,**

    **PLAINTIFFS,**                             **ADV. PRO. NO. 17-00007-8-SWH**

v.

**TEDDY DALE PARKER, VICTORIA
STONE PARKER, PARKER MANUFACTURING
2, LLC, AND PARKER MANUFACTURING,
INC.**

    **DEFENDANTS.**

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS

The matter before the court is the motion to dismiss adversary proceeding filed by Teddy Dale and Victoria Stone Parker (the "Debtors" or "Parkers"), Parker Manufacturing 2, LLC ("PM2"), and Parker Manufacturing, Inc. ("PMI") (collectively, the "Defendants") on October 10, 2017, Dkt. 3 (the "Motion"). A response in opposition and memorandum of law were filed by

1

the Plaintiffs on November 3, 2017, Dkt. 5. A hearing was held in Raleigh, North Carolina on December 6, 2017, at which the court took the matter under advisement. For the reasons that follow, the court will deny the Motion.

## I. BACKGROUND

### A. Chapter 11 Case Background

Teddy Dale and Victoria Stone Parker (the "Debtors" or the "Parkers") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 10, 2012. On their schedules, the Debtors listed assets in the aggregate amount of $7,681,772.02 and liabilities totaling $8,399,194.20. The Debtors' scheduled the fair market value of their residence located at 7446 Highway 72, Lumberton, North Carolina (the "Residence") as $3,010,700, encumbered by a secured claim in the total amount of $739,934. The Debtors also listed ownership of an office building in Lumberton, North Carolina on Long Branch Road (the "Long Branch Property") with a scheduled value of $140,800.

Mr. and Mrs. Parker also scheduled ownership interests in one North Carolina corporation named Parker Manufacturing, Inc. ("PMI") and one North Carolina limited liability company named Parker Manufacturing 2, LLC ("PM2") as assets on Schedule B. Their interests in PMI were valued at $750,000, and their interests in PM2 were valued at $3,000,000. Through PM2, the Debtors owned and operated two mobile home parks as of the petition date: (1) Lafayette Plantation in Fayetteville, North Carolina and (2) Waynesville Plantation in Lumberton, North Carolina. As of the petition date, the Debtors' primary income source was the rents received from the two mobile home parks.

On September 26, 2012, Branch Banking & Trust Company ("BB&T") filed a proof of claim in the amount of $826,414.20. Proof of Claim No. 16-1. BB&T's claim was based on a

2

promissory note executed by the Parkers in August of 2001 and secured by a deed of trust on real property owned by PMI in Greenville County, South Carolina. BB&T's secured claim was subsequently assigned to RREF BB Acquisitions, LLC ("RREF" or "Creditor"), and RREF filed a proof of claim in the amount of $826,414.20 on February 4, 2013 to reflect its ownership of the debt. Proof of Claim No. 26-1.

### B. Post-Petition, Pre-Confirmation Events

In December of 2012, PM2 sold real property in Fayetteville, North Carolina ("Lafayette Plantation") for the sum of $3,460,000. PM2 received an estimated $986,000 in net proceeds from the sale. The Plaintiffs contend that the Parkers personally used these proceeds and further contend that the sale was never disclosed to creditors through the disclosure statement or other form of notice.

On June 3, 2013, prior to confirmation, the Parkers and RREF entered into a consent order regarding RREF's voting rights as to the chapter 11 plan, Dkt. 155 (the "Consent Order"). The Consent Order provided that for purposes of chapter 11 plan voting, RREF would be permitted to vote a $526,414.20 secured claim in Class 14 and a $300,000 claim in the general unsecured creditors' class (Class 18).

### C. Confirmation of the Chapter 11 Plan

*1. Terms of the Second Amended Plan*

The Debtors initially filed a plan of reorganization (the "Plan") on December 7, 2012, Dkt. 60. In order to fund the Plan, the Debtors anticipated continued income from the ongoing operation of Waynesville Plantation. The Plan defined the Effective Date as "14 days from the date of entry of the Order Confirming Plan." Dkt. 173 at 3.

3

Class 14 of the Plan proposed to treat BB&T's claim as impaired. Specifically, the Parkers, through PMI, proposed to surrender the Greenville County, South Carolina property (the "South Carolina Property") to BB&T and allow BB&T ninety days to file an unsecured deficiency claim. The Plan was subsequently amended on April 11, 2013, Dkt. 130 and again on August 2, 2013, Dkt. 173 (the "Second Amended Plan"). The Second Amended Plan reflected RREF's ownership of BB&T's debt and proposed to allow the Parkers to market and sell, rather than surrender, the South Carolina Property. The Plan described the treatment of RREF's claim as follows:

> (2) Impairment. This class will be impaired.
> (3) Treatment. This claim shall be treated as follows:
>> a. RREF shall have an unsecured claim in the Debtors' case for $826,414.20.
>> b. Interest shall accrue from the Effective Date of the Plan at the federal judgment rate.
>> c. Parker Manufacturing shall have 6 months from the Effective Date to market and sell to the Property.
>> d. If Parker Manufacturing does not have a signed contract for the purchase of the ["South Carolina Property"] within 6 months of the Effective Date, which sale must close within 8 months of the Effective Date, the Debtors shall cause the Property to be sold via public auction on or before 10 months of the Effective Date.
>>> i. RREF reserves its right to credit bid at the public auction.
>>> ii. RREF and Parker Manufacturing shall agree to an auctioneer to sell the Property. If the Debtors and RREF cannot agree to the selection of an auctioneer, the Bankruptcy Court shall retain jurisdiction to decide the matter.
>>> iii. If the auction results in a winning bidder or bidders, the high bidder(s) shall have 30 days from the auction date to close the sale(s). RREF shall be entitled to prompt distribution of all net proceeds of any auction sale that it approves to the extent necessary to satisfy its claim against the Debtors in full, including all legal fees and costs

4

> e. Net proceeds shall reduce the RREF claim against the Debtors on a dollar for dollar basis.
> . . .
> g. The balance of RREF's claim *shall be treated in Class 18* [the general unsecured class].

Dkt. 173 at 16-17. Pursuant to the Second Amended Plan, RREF was to receive the proceeds from the sale of the South Carolina Property. Should the proceeds fail to satisfy RREF's claim in full, any deficiency balance was to be treated in accordance with Class 18 of the Second Amended Plan. Pursuant to the Consent Order, RREF was allowed a $526,414.20 secured claim for voting purposes in Class 14 and a $300,000 general unsecured claim for voting purposes in Class 18.

The Second Amended Plan provided general unsecured creditors with two options. First, each unsecured creditor could elect to receive payment of its claim in full within three years of the Plan's Effective Date ("Option One"). In order to generate the capital necessary to make such lump sum payments, the Debtors intended to sell or refinance their Residence. To guarantee this payment, the Debtors also proposed to execute a promissory note in favor of the unsecured creditors who elected to Option One in the total amount of their collective claims, which was to be secured by a second-position deed of trust on the Debtors' Residence. The promissory note would mature within three years of the Plan's Effective Date, and the Debtors were not required to make payments on the promissory note until their Residence sold or was refinanced.

In the alternative, creditors in Class 18 could elect to receive the sum of ten percent of their individual claims within seven days of the Plan's Effective Date ("Option Two"). In order to fund the Option Two, the Debtors intended to borrow funds on hand from PM2. In voting to accept the Plan, RREF chose Option One. RREF was the *sole* unsecured creditor to choose the treatment offered pursuant to Option One.

5

Section V of the Second Amended Plan, entitled "Means of Execution," expressly provided for the creation of a plan trust and appointment of a plan trustee in order to ensure payment of two classes of creditors: (1) Class 8, Personal Investments, Inc., holder of a note in the approximate amount of $800,000 secured by a first-position deed of trust on the Residence and (2) those members of Class 18 who chose Option One. A copy of the proposed trust agreement (the "Trust Agreement") was attached to the Second Amended Plan as Exhibit 1. In addition, Section XI of the Second Amended Plan, entitled "Effect of Confirmation," stated that "except as otherwise provided . . . the confirmation of the [Second Amended] Plan vests all of the property of the estate in the Debtors."

*2. Plan Confirmation, the Promissory Note, and the Plan Trust Agreement*

RREF filed an accepting ballot as the sole creditor in Class 14 and also filed an accepting ballot in the amount of $300,000 as one of two creditors in Class 18, Dkt. 197. After conducting a hearing regarding confirmation on October 16, 2013, the court issued an order confirming plan on November 19, 2013, Dkt. 203. No party objected to confirmation, and the Effective Date of the Second Amended Plan was December 3, 2013.

On December 6, 2013, the Parkers executed a promissory note in favor of the Plan Trustee in the amount of $826,414.20 (the "Note"), which was secured by a second-position deed of trust on their residence (the "Deed of Trust"). The Note and Deed of Trust were executed contemporaneously with the Trust Agreement, and the Note stated a maturity date of December 3, 2016. The Deed of Trust was timely recorded in Robeson County, North Carolina.

As provided for in Section V of the Second Amended Plan, the Trust Agreement was executed shortly after confirmation on December 6, 2013, and it appointed Margaret R. Westbrook, Esq. as the plan trustee (the "Plan Trustee"). The Trust Agreement was executed in

6

order to ensure the Debtors' compliance with the Second Amended Plan and provided that the trust's assets would consist of the "Deed of Trust and any payments thereon, as well as any other recoveries by the Plan Trustee." The Trust Agreement expressly authorized the Plan Trustee to undertake twelve enumerated actions, including the authority to "collect and receive any and all money and other property . . . owing . . . to the Parker Plan Trust," to "determine the amount due to each of the [c]reditors," and to "prosecute causes of action in the name of the [Trust]." Dkt. 203, Ex. 1 at 4.

The Trust Agreement also stated that upon the Debtors' default on payments to Class 8 or within ninety days of the maturity date of the Note, the Plan Trustee could "oversee the sale of the Residence." Following a sale by the Plan Trustee, "to the extent the sale of the residence does not pay the Class 18 Unsecured Creditors in full, plus the reasonable expenses of the Plan Trustee, the outstanding balances due . . . shall be liabilities of the Debtors, to be paid within ninety (90) days following the sale of the Residence." Finally, the Trust Agreement empowered the Plan Trustee "to seek collection of the amount due under the [Note] and any attorneys' fees incurred if the Debtors do not pay the balance within ninety (90) days after the sale is concluded." The same sale procedure could be invoked by the Plan Trustee if the ad valorem taxes on the Residence became more than sixty days past due.

The Trust Agreement contained an express retention of jurisdiction clause, which provides the following:

> [T]he Bankruptcy Court shall retain exclusive jurisdiction over the Plan Trust, including, without limitation, jurisdiction to resolve any and all controversies, suits, and issues that may arise in connection with the Plan Trust. The Plan Trustee hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court in any action to enforce, interpret, or construe any provision of this Agreement . . . . The Plan Trustee further irrevocably agrees that any action to enforce, interpret, or construe any provision of this Trust Agreement

7

>  will be brought only in the Bankruptcy Court, unless the Bankruptcy Court does not have, or declines to take, jurisdiction . . . .

Dkt. 203, Ex. 1 at 7 (the "Retention Clause").

### D. Post-Confirmation Events

*1. Substantial Consummation and Final Decree*

The Parkers moved for entry of a final decree on January 27, 2014, Dkt. 211 and filed a final report with their motion, Dkt. 212. The court entered a final decree on February 13, 2014, Dkt. 217, which provided that "[t]he plan of the [Parkers] has been substantially consummated as provided in 11 U.S.C. § 1101(2). It is ordered that this case is closed."

*2. RREF's Motion to Reopen, the Parties' Amendment to the Plan, and Sale of the South Carolina Property*

RREF moved to reopen the case on November 4, 2014, Dkt. 219 (the "Motion to Reopen"). In the Motion to Reopen, RREF explained that the Plan required the Parkers to market and sell the South Carolina Property within eight months of the Effective Date, failing which the Debtors would sell the South Carolina Property via a public auction within ten months of the Effective Date. On December 3, 2014, RREF filed a motion for finding of default, Dkt. 223. The Parkers and RREF entered into a second consent order on January 16, 2015, Dkt. 231 (the "Second Consent Order"). The Second Consent Order clarified the amounts owed to RREF and provided that "RREF shall have an unsecured claim in the Debtors' case for $826,414.20 plus interest at 5.5% from the Petition Date through the Effective Date and actual attorneys' fees and expenses billed until RREF is paid in full . . . ." The Parkers liquidated the South Carolina Property on March 10, 2015, and RREF received $164,282.24 from the sale.

*3. Transfer of Long Branch Property*

On December 2, 2014, the Parkers transferred their individual ownership of the Long Branch Property to PM2. The Plaintiffs contend that this transfer occurred without consideration, such that the Parkers did not receive reasonably equivalent value in exchange.

*4. Sale of Waynesville Plantation*

On March 25, 2015, PM2 sold its remaining mobile home park, Waynesville Plantation, to a third party for $900,000. Because Waynesville Plantation was unencumbered, PM2 received net proceeds in the amount of $849,669.30 upon the closing of the sale. The Plaintiffs allege that the Parkers used these proceeds for living expenses and to purchase a new residence. Importantly, the income stream from Waynesville Plantation, which was earmarked to fund the Debtors' Second Amended Plan, ceased upon the property's sale in 2015.

*5. Sale of the Residence and RREF's Claim at Present*

The Residence sold in May of 2016 for the sum of $1,300,000. Following payment of real estate brokers, the first-position deed of trust creditor, and unpaid ad valorem property taxes, RREF received a net payment of $116,284.91. After distributing the sale proceeds, the Plan Trustee released the second-position Deed of Trust.

Following application of the proceeds from the sale of the South Carolina Property and the sale of the Residence, RREF is owed $549,612.55 in principal, $111,704.92 in attorneys' fees and costs, and all costs and fees owed to the Plan Trustee and her counsel. Pursuant to the Trust Agreement, these balances, plus all amounts owed to the Plan Trustee individually, were to be paid in full by the Debtors individually within ninety days of the sale of the Residence, i.e. late August of 2016, but no payment has been made.

*6. Adversary Proceeding*

The Plaintiffs initiated the adversary proceeding on September 8, 2017. In the complaint, they allege three primary causes of action: (1) breach of the Note and Plan for failure to make all payments as required by the Plan's Trust Agreement; (2) piercing of the corporate veil as to PMI and PM2 to permit the Plan Trustee to recover corporate assets; and (3) avoidance of a fraudulent transfer of an office building in Robeson County, North Carolina from the Debtors to PM2 in December of 2014.

## II. DISCUSSION

In the Motion, the Parkers request dismissal of the adversary proceeding based Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Parkers do not contest the Plan Trustee's standing to bring claims and concede that nothing precludes the Plaintiffs from bringing their claims in state court. However, the Parkers contend that the bankruptcy court lacks subject matter jurisdiction over the Plaintiffs' three causes of action. In addition, the Parkers assert that if the court has subject matter jurisdiction, the Plaintiffs nonetheless failed to state claims upon which relief could be granted, such that the adversary proceeding must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Subject Matter Jurisdiction

*1. Subject Matter Jurisdiction and Federal Rule of Civil Procedure 12*

Federal Rule of Civil Procedure 12 is made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012. Rule 12(b)(1) provides that a party may assert "lack of subject-matter jurisdiction" as a defense to a claim for relief. FED. R. CIV. PRO. 12(b)(1). If a court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3). A case is "properly dismissed for lack of subject matter

jurisdiction . . . when the . . . court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d. Cir. 2000). A court may consider whether it has subject matter jurisdiction over a matter or proceeding at any time. *Id.*; *see also* FED. R. CIV. P. 12(h)(3).

Subject matter jurisdiction is "jurisdiction over the nature of the case and the type of relief sought; [or] the extent to which a court can rule on the conduct of persons or the status of things." BLACK'S LAW DICTIONARY (10th ed. 2014). A bankruptcy court's jurisdiction, "like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). As a result, a bankruptcy court must first examine the governing statutes in determining whether it has subject matter jurisdiction. *Id.* Section 1334 of Title 28 of the United States Code states the following:

> (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
>
> (b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(a)-(b). However, a district court "may provide that any or all cases under title 11 and any or all proceedings *arising under* title 11 or *arising in* or *related to* a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a) (emphasis added). In short, 28 U.S.C. § 1334 initially provides the district courts with original and exclusive jurisdiction over Title 11 matters, and 28 U.S.C. § 157(a) grants the district courts discretion to confer this jurisdiction upon bankruptcy courts. Based upon 28 U.S.C. § 157(a), the United States District Court for the Eastern District of North Carolina entered a general order that refers its subject matter jurisdiction over "any and all cases under Title 11 and any and all proceedings under

Title 11 or arising in or related to a case under Title 11 . . . to the bankruptcy judges for the Eastern District of North Carolina." Referral of Bankruptcy Matters to Bankruptcy Judges (E.D.N.C. Aug. 3, 1984) (the "1984 Referral Order"). Taken together, both statutes and the 1984 Referral Order provide this court with "original, but not exclusive, jurisdiction over every civil proceeding 'arising under' the Bankruptcy Code, 'arising in' the Bankruptcy Code, or 'related to' a bankruptcy case." *In re Brier Creek Corp. Center Assoc. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013) (citations omitted).

*2. Subject Matter Jurisdiction Cannot Be Created*

Subject matter jurisdiction cannot be conferred upon a court by express language contained in a chapter 11 plan, consent of the parties, or any other agreement. *New Horizon of N.Y., LLC v. Jacobs*, 231 F.3d 143, 155 (4th Cir. 2000) (noting that "[a] plan cannot confer jurisdiction upon a bankruptcy court or federal district court . . . rather, 28 U.S.C. § 1334 governs jurisdiction"). While an agreement's retention of jurisdiction clause may indicate the intent of the parties, such a clause is not controlling. *See Gupta v. Quincy Medical Ctr.*, 858 F.3d 657, 664 (1st Cir. 2017) (explaining that "despite the routine inclusion of retention-of-jurisdiction provisions . . . they may only be given effect if there is jurisdiction under 28 U.S.C. § 1334(b)") (citations omitted). Similarly, subject matter jurisdiction cannot be unilaterally created by a bankruptcy court, as a bankruptcy court's jurisdiction is limited to the three categories delineated by statute.

In this case, the parties agreed to a Jurisdiction Retention Clause in the Trust Agreement. While this is potentially indicative of their intent to resolve disputes regarding the Trust Agreement in the bankruptcy court, it fails to independently create subject matter jurisdiction. As a result, it is necessary for the court to consider whether the Plaintiffs' claims "arise under," "arise in," or are "related to" Title 11 such that subject matter jurisdiction over the claims exists.

*3. Proceedings "Arising Under" Title 11*

Proceedings "arise under" title 11 "if they invoke a 'substantive right created by federal bankruptcy law.'" *In re BMOC Inv'rs, LLC*, 2014 WL 5024072, at *2 (Bankr. E.D.N.C. Oct. 7, 2014) (quoting *Wood v. Wood* (*In re Wood*), 825 F.2d 90, 97 (5th Cir. 1987)). "Arising under" jurisdiction exists when "the Bankruptcy Code itself creates the plaintiff's cause of action or 'if the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal bankruptcy law.'" *In re Baseline Sports*, 393 B.R. 105, 121-22 (Bankr. E.D. Va. 2008) (citations omitted). In establishing "arising under" jurisdiction, Congress sought to enable "bankruptcy courts . . . to hear any matter under which a claim is made under a provision of title 11. For example, a claim [arising] under 11 U.S.C. § 522 would be cognizable by the bankruptcy court . . . ." H.R. Rep. No. 595, 95th Cong., 1st Sess. 445 (1977).

In this case, the Plaintiffs' causes of action are based upon North Carolina statutes and North Carolina common law. No substantive bankruptcy rights are implicated, and no federal bankruptcy question is presented. Accordingly, the court declines to find "arising under" jurisdiction over the Plaintiffs' claims for relief.

*4. Proceedings "Arising In" Title 11*

A matter or proceeding "arises in" title 11 when it is "not based on any right expressly created by Title 11, but nevertheless would have no existence outside of the bankruptcy." *In re 3G Properties, LLC*, 2010 WL 4027770, at *2 (Bankr. E.D.N.C. Oct. 14, 2010) (citing *Bergstrom v. Dalkon Shield* (*In re A.H. Robins Co.*), 86 F.3d 364, 372 (4th Cir. 1996)). In *Bergstrom*, the United States Court of Appeals for the Fourth Circuit found "arising in" jurisdiction where the underlying controversy "would have no practical existence but for the bankruptcy." *Bergstrom* at 372. The Fourth Circuit reiterated and expounded upon this standard in *Grausz v. Englander*, 321

13

F.3d 467 (4th Cir. 2003). In *Grausz*, the court concluded that "arising in" jurisdiction existed over a malpractice claim "against a lawyer for providing negligent advice to a debtor," based upon the fact that the claim arose out of the bankruptcy case itself. *Grausz* at 471 (citations omitted). Other examples of matters over which a bankruptcy court has "arising in" jurisdiction include "administrative matters, orders to turn over estate property, determination of the extent or priority of liens, contempt matters, and actions to recover post-petition accounts." *In re Redf Mktg., LLC*, 536 B.R. 646, 662 (Bankr. W.D.N.C. 2015) (quoting *In re Tate*, 253 B.R. 653, 661 (Bankr. W.D.N.C. 2000)).

However, when a claim for relief "pre-dates the filing of the [c]hapter 11 case, [it] cannot be said to have arisen within that case." *Valley Historic Ltd. v. Bank of N.Y.*, 486 F.3d 831, 836 (4th Cir. 2007). "Arising in" jurisdiction also does not exist where a claim for relief bears only a "coincidental relationship" to the underlying bankruptcy. *Id*.

In contending that the court lacks "arising in" jurisdiction, the Parkers rely upon the analysis and holding of *In re Ohnmacht*, in which the bankruptcy court declined to find "arising in" jurisdiction over claims for breach of a chapter 11 plan and tortious interference. *In re Ohnmacht*, No. 09-08106-8-DMW, 2017 WL 5125531, at *12 (Bankr. E.D.N.C. Nov. 3, 2017). This reliance is misplaced, as the facts of the present case are readily distinguishable from those of *Ohnmacht*. *Ohnmacht* involved a pre-petition judgment creditor's alleged breach of the debtors' confirmed, consummated chapter 11 plan based on the creditor's failure to cancel its judgment per the terms of the plan. The plaintiff-debtors' claims for relief arose post-confirmation. The bankruptcy court concluded that it did not have "arising in" jurisdiction over claims for breach of the chapter 11 plan and reasoned that the parties "could have agreed to the plan's treatment of the . . .debt . . . outside of the bankruptcy arena; therefore, the contractual obligations set forth in the

14

Plan cannot be considered to exist 'but for' the Plaintiffs' bankruptcy case." *Id*. The *Ohnmacht* court ultimately concluded that the "proper forum for adjudication of breach of contract claims related to the plan is the state court." *Id*.

In this case, the Plaintiffs are alleging not only breach of the Second Amended Plan, but also breach of the Trust Agreement. The Trust Agreement must credit its existence on the bankruptcy itself. But for the Parkers' bankruptcy filing and resultant chapter 11 plan, the Trust Agreement would not exist and RREF's rights would be contractually limited to those contained in its original note. The Second Amended Plan and Trust Agreement, both of which resulted from the Parkers' chapter 11 bankruptcy, *created* the Plaintiffs' enforcement rights against the Parkers at present.

Further, the Trust Agreement fundamentally changed RREF's rights, in that it effectively transformed a pre-petition debt to a post-petition debt with additional security and foreclosure rights. Absent bankruptcy, it is extremely unlikely that the Parkers would have voluntarily offered RREF a second-position Deed of Trust on their Residence merely to offset an otherwise unsecured deficiency. Without the Trust Agreement, RREF's recovery would have remained limited to the South Carolina Property, as provided in its underlying note, and RREF would have no collection rights against the Debtors' Residence or against the Debtors individually at present.

The Plaintiffs' claims did not merely coincide with the Parkers' chapter 11 bankruptcy, nor do they have a "practical existence" outside of the bankruptcy. Rather, the claims were borne out of and created by a specific instrument executed in connection with the bankruptcy. Simply put, the claims would not exist had the Parkers not filed for relief under chapter 11. It is also noteworthy that the Trust Agreement regulates the Parkers' relationship with two classes of creditors: Classes 8 and 18. The creation of this dual agency is also dependent upon the

15

bankruptcy. The Second Amended Plan and Trust Agreement created and anticipated the causes of action before the court. As a result, the court finds that it has "arising in" jurisdiction over the Plaintiffs' claims.

*5. Proceedings "Related To" Title 11*

While the court concludes that "arising in" jurisdiction exists over the Plaintiffs' claims, it is useful to consider "related to" jurisdiction, as the Plaintiffs' claims all arose in the post-confirmation context. The Supreme Court of the United States examined "related to" jurisdiction in *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S. Ct. 1493 (1995). In that case, the Court explained that "related to" jurisdiction exists if "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Celotex* at 308 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d. Cir. 1984)). The Court expounded upon this standard and found that "an action is *related to* bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and in any way impacts upon the handling and administration of the bankruptcy estate." *Id.* (emphasis added).

The United States Court of Appeals for the Fourth Circuit established that in evaluating "related to" jurisdiction over post-confirmation proceedings or controversies, a bankruptcy court should consider "whether there is a *close nexus* to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Valley Historic* at 836 (emphasis added) (quoting *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166 (3d Cir. 2004)). The Fourth Circuit's "close nexus" analysis was derived from the United States Court of Appeals for the Third Circuit's decision in *Binder*, in which the Third Circuit clarified that "matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." In adopting the Third Circuit's

16

"close nexus" test for determining post-confirmation "related to" jurisdiction, the Fourth Circuit reasoned that "[the close nexus inquiry] insures that the proceeding [at issue] serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction." *Valley Historic* at 837.

In this case, the Second Amended Plan was substantially consummated nearly four years ago, and the Defendants contend that this fact precludes the existence of "related to" jurisdiction over the Plaintiffs' claims. The passage of time or entry of a final decree does not conclude a bankruptcy court's post-confirmation "related to" jurisdictional inquiry; rather, a bankruptcy court must independently analyze whether the controversy at issue bears a sufficiently "close nexus" to the bankruptcy proceeding. *See Valley Historic* at 838. Here, the Plaintiffs' claims are based upon the rights created by the Trust Agreement. The Debtors' Second Amended Plan specifically contemplated the creation of the Trust and execution of the Trust Agreement in order to protect two creditors, and the Trust Agreement functioned as supplemental security of the Debtors' performance under the Second Amended Plan. It is clear to the court that under these facts, there is a "close nexus" between the Second Amended Plan, the Trust Agreement, and the Plaintiffs' claims for relief. As a result, the court has "resulting to" jurisdiction in addition to "arising in" jurisdiction over the Plaintiffs' claims.

### B. Failure to State a Claim for Relief

*1. Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6)*

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." If a complaint fails to meet this threshold obligation, the action should be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." FED.

R. Civ. P. 12(b)(6). For purposes of Rule 12(b)(6), all allegations of fact contained in a complaint must be accepted as true. *E.I. du Pont de Nemours &Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011).

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court of the United States held that a complaint must include "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). The Court elaborated in *Ashcroft v. Iqbal* that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and that "only a complaint that states a plausible claim for relief survives a motion to dismiss." 129 S. Ct. 1937, 1950 (2009); *see also Adcockv. Freightliner, LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (mere legal conclusions do not warrant automatic assumption of truth by the court). The allegations must be more than a "formulaic recitation of the elements" of a claim. *Iqbal,* 129 S. Ct. at 1951.

A claim has facial plausibility when the plaintiff pleads enough "factual content to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 554 (4th Cir. 2013). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S. Ct. at 1949; *see also Angell v. BER CARE, Inc. (In re Caremerica, Inc.)*, Adv. Pro. No. L-08-00174-8-AP (Bankr. E.D.N.C. July 23, 2009) (setting out a detailed analysis of *Twombly* and *Iqbal*). Thus, dismissal under Rule 12(b)(6) is proper when, from the face of the complaint, it is clear that the plaintiff's claims are not supported by law, that one or more facts necessary to assert a valid claim have not been pled, or that facts exist that necessarily defeat the plaintiff's claims.

In this case, the Plaintiffs allege three separate causes of action: (1) breach of Plan and Plan Note; (2) piercing the corporate veil; and (3) avoidance of a fraudulent transfer of assets owned by the Parkers to PM2. At the hearing, counsel for the Defendants conceded that the Plaintiffs had sufficiently pled both the breach of Plan and Plan Note claim and the piercing the corporate veil claim. As a result, the court need only consider whether the Plaintiffs' third claim for relief concerning the fraudulent transfer of assets is facially plausible such that it satisfies the standards imposed by *Twombly*, *Iqbal*, and Federal Rule of Civil Procedure 8(a)(2).

In order to avoid a fraudulent transfer under North Carolina General Statute § 39-23.4, a plaintiff must establish the following: (1) a debtor made a transfer or incurred an obligation and (2) with actual intent to hinder, delay, or defraud a creditor or without receiving a reasonably equivalent value in exchange. Here, the facts alleged in the complaint, taken as true, amount to far more than a "formulaic recitation of the elements" of a fraudulent transfer. The Plaintiffs' complaint contains detailed facts to support each legal element, including identification of the parties, dates, and property at issue, details regarding the transfer transaction, and other material facts. Taken together, the complaint presents a plausible claim for relief supported by law, as required by *Twombly* and *Iqbal*. Based upon the contents of the complaint, the court finds that the Plaintiffs' claim for relief regarding avoidance of a fraudulent transfer is plausible on its face and satisfies Federal Rule of Civil Procedure 8(a)(2).

### III. CONCLUSION

Based on the foregoing, the Defendants' Motion to Dismiss Adversary Proceeding pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), made applicable in this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, is **DENIED**.